# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| IDAET ETEMI,<br>      Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br>      Defendant. | No. 3:16-cv-1328 (SRU) |

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In this Social Security appeal, Idaet Etemi moves to reverse the decision by the Social Security Administration ("SSA") denying her claim for disability insurance benefits. Mot. to Reverse, Doc. No. 21. The Commissioner of Social Security moves to affirm the decision. Mot. to Affirm, Doc. No. 30. For the reasons set forth below, I DENY Etemi's Motion to Reverse the Decision of the Commissioner (Doc. No. 21) and GRANT the Commissioner's Motion to Affirm its Decision (Doc. No. 30).

## I. Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e., an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does not have a severe impairment, the Commissioner determines whether the impairment is considered "per se

disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc.*

2

*Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447-48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II. Facts

Idaet Etemi filed for Social Security disability benefits on December 6, 2012, alleging a period of disability from January 2, 2009. *See* Disability Determination Decision, R. at 11. At the time of the alleged onset of disability, Etemi was 44 years old. Int'l Disability Determination Explanation, R. at 50. Etemi identified her disability as right and left arm injuries, asthma, high blood pressure, thyroid, and Addison's Disease. *Id.* The SSA initially denied her claim on January 29, 2013, finding that although Etemi's "condition resulted in some limitations in [her] ability to perform work related activities … [her] condition was not disabling." *Id.* at 59. The SSA went on to say that it "studied [her] records, including the medical evidence and [her] statements, and considered [her] age and education in determining how [her] condition affected [her] ability to work." *Id.* Further, it stated it did not "have sufficient vocational information to determine whether [she could] perform any of [her] past relevant work." *Id.* In the agency's

3

view, she could "adjust to other work." *Id.* At the time of the agency's denial, Etemi was 49 years old. *Id.*

Etemi sought reconsideration, alleging that her right arm was numb from her "shoulder down to fingers." Notice of Reconsideration, R. at 84. The SSA again denied her claim on reconsideration on April 25, 2013 stating that her "condition is not severe enough to keep [her] from working" and that she can "adjust to other work." *Id.* In the Reconsideration Explanation, it was noted that Etemi's statements about her conditions were not "substantiated by the objective medical evidence alone" and were only "partially credible." Reconsideration Explanation, R. at 70.

Etemi requested a hearing before an Administrative Law Judge, which was held via video-conference on October 9, 2014. Tr. of ALJ Hr'g, R. at 29. At the hearing, ALJ Gerald Resnick questioned Etemi about her conditions and treatment history, particularly asking questions regarding her capacity to perform daily working and living functions. *Id.* at 35-37. Etemi responded that she could only sit comfortably for "10, 15 minutes," could stand for "five, 10 minutes," and could walk for "10, 15 minutes." *Id.* at 35-36. She further testified that she could lift and carry "three to five pounds." *Id.* at 36. The ALJ asked Etemi a number of questions regarding the use of her hands, to which she responded that "a lot of [her] fingers on [her] right side [don't] even work." *Id.* at 37. She testified that she did not think she could work eight hours per day, five days per week. *Id.* at 39. She testified that she didn't sleep well at night, so she laid down from 2:00 pm to 5:00 pm every day. *Id.* at 42.

The ALJ then heard testimony from Kenneth R. Smith, a neutral vocational expert who testified that Etemi was employed in "light and medium" housekeeping. Tr. of ALJ Hr'g, R. at 43. The ALJ then asked Smith to assume that the ALJ found Etemi's testimony credible that she

"needed to lie down three hours in the afternoon … can only sit comfortably for 15 minutes, stand for five to 10 minutes, life and carry three to five pounds … can only walk for 10 to 15 minutes, that she has problems with her right thumb … [s]he can only write for three to four minutes[, s]he'd be unable to perform reaching above her right shoulder[, and s]he'd be unable to perform repetitive pushing or pulling of arm controls [and that she could not] concentrate and focus [and could not] work eight hours a day five days a week" and has a problem with "dust, humidity, fumes, and pollutants." *Id*. at 44-45. Based upon those assumptions, Smith testified that there were no jobs available to her. *Id.* at 45.

The ALJ then referenced Exhibit 3A, the Reconsideration Explanation, R. at 62, and changed the hypothetical to being able to "lift and carry 20 pounds occasionally and 10 pounds frequently, sits six hours out of an eight hour work day, stand and walk six hours out of an eight hour work day, frequently climb ramps and stairs, occasionally climb ladders, ropes, or scaffolding, frequently balance, frequently stoop, frequently kneel, frequently crouch, frequently crawl" and "avoid exposure to dust, fumes, and pollutants." Tr. of ALJ Hr'g, R. at 45. With those assumptions, Smith testified that there was "light work" available as an assembler, packager, or inspector. *Id.* at 46. On cross-examination by Etemi's lawyer, Smith stated that those jobs would require reaching over the head, and would not be available at a "full-time competitive basis" if the employee missed two or three days of work per month. *Id.* at 47.

On October 30, 2014, the ALJ issued an opinion in which he found that Etemi "was not under a disability within the meaning of the Social Security Act from January 2, 2009, through the date last insured[, September 30, 2012]." ALJ Decision, R. at 11. At the first step, the ALJ found that Etemi "did not engage in substantial gainful activity during the period from her alleged onset date of January 2, 2009, through her date last insured of September 30, 2012." *Id.*

5

at 13. At the second step, the ALJ determined that Etemi's impairments of "asthma/chronic obstructive pulmonary disease, carpal tunnel syndrome status post[-surgery], and tenosynovitis of the right thumb/finger status post-surgery" were "severe impairments" that "have more than a minimal impact on [her] functioning." *Id.*

The ALJ cited five years of medical records and found that a number of her claimed impairments were not severe. *Id.* at 13-16. He opined:

> [Etemi] occasionally reported chest pain; however extensive cardiac examinations and tests were unremarkable and cardiac catheterization was not indicated. Further, she had an episode of rectal bleeding and diverticulosis that resolved with limited treatment. While she alleged a hearing loss, testing revealed normal hearing then a slight/mild loss and no source observed difficulty hearing. She reported dizziness and sinus symptoms with unremarkable examinations. She also had two thyroid aspirations that revealed a benign hyperplastic nodule that did not require treatment. Further, she had mild, non-positional obstructive sleep apnea with no significant treatment/symptoms. While she told [her doctor] that she had recurrent nosebleeds since childhood, she had no emergency room visits for such, she denied epistaxis in records, and there was otherwise no mention of this. She has controlled hypertension … within normal blood pressure and no end organ damage or other associated symptoms. She has a diagnosis of reflux disease yet she generally denied heartburn. She also reported migraines, hyperthyroidism, a hiatal hernia, a rash, acne, and anemia yet she generally denied headaches, she had little treatment for these, and exams were unremarkable. She had controlled diabetes with treatment as she had no symptoms despite an intermittent elevation in HgA1c. She had an episode of left breast tenderness with unremarkable exams and a benign biopsy. She is overweight at 60 to 64 inches and 193 to 174 pounds yet she did not report any associated symptoms/limitations. Based on the limited findings on examinations and testing, the positive response to treatment, the lack of presentation for some complaints, and her activities, these were not severe impairments.

*Id.* at 15-16. The ALJ also noted that "[b]ased on the limited presentation and complaints and the general observations that [Etemi] was pleasant with a normal/appropriate affect, the record does not support a severe psychiatric impairment." *Id.* at 16.

At the third step, the ALJ determined Etemi "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments" because she "did not have pulmonary testing demonstrating a listings level impairment or the

6

frequency of hospitalizations, urgent office visits or emergency room visits to meet a respiratory listing and [she] was able to ambulate and use the extremities effectively such that [she] did not meet a neurological listing. Further, no source opined [that Etemi] equaled a physical listing." ALJ Decision, R. at 16-17.

The ALJ then assessed Etemi's residual functional capacity, and found that she could "perform light work" with certain limitations. *Id.* at 17. Those limitations were that Etemi (1) could only "lift and/or carry 20 pounds occasionally and 10 pounds frequently," (2) could "sit for about six hours and stand and/or walk for about six hours in an 8-hour workday," (3) could "frequently crawl, crouch, kneel, stoop, balance, and climb ramps and stairs," (4) could "occasionally [climb] ladders, ropes, and scaffolds," and (5) could not "be exposed to concentrated fumes, odors, dust, gases or poor ventilation." *Id.* The ALJ cited numerous medical records, *id.* at 18-20, and concluded that Etemi's "medically determinable impairments could not reasonably be expected to cause the alleged symptoms to the degree alleged." *Id.* at 20. He further concluded that Etemi's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.* The ALJ discredited Etemi's testimony regarding how much time she could spend sitting, walking, and standing, and her limitations on the use of hands, lifting, and carrying were "not substantiated by competent medical evidence to the degree alleged." *Id.*

At the fourth step, the ALJ determined that Etemi "was unable to perform any past relevant work" as a housekeeper because of the "inability to tolerate concentrated exposure to fumes, odors, dust, gases, and poor ventilation." ALJ Decision, R. at 23. At the fifth step, the ALJ concluded that, based on Etemi's "age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [she]

could have performed." *Id*. "Based on the testimony of the vocational expert … [Etemi] was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." *Id.* at 24. Accordingly, the ALJ concluded that "[a] finding of 'not disabled' [was] therefore appropriate" and denied Etemi's request for disability benefits. *Id.*

Etemi requested a review of the ALJ's decision by the SSA's Appeals Council on December 30, 2014. Request for Review of Hearing Decision/Order, R. at 5-7. Holding that there was "no reason … to review the [ALJ]'s decision," the Appeals Council "denied [Etemi's] request for review" on June 7, 2016. Notice of Appeals Council Action, R. at 1-4. Etemi then filed a complaint before this court urging reversal of the Commissioner's decision on August 4, 2016. Compl., Doc. No. 1.

### III. Discussion

On review, Etemi asserts that the ALJ's "findings are not supported by substantial evidence in the record as a whole and/or that the [ALJ]'s decision was not rendered in accordance with law." Mot. to Reverse, Doc. No. 21, at 1. Specifically, she contends that the ALJ failed to develop the administrative record, Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 1; that the ALJ failed to consider Etemi's impairments in combination, *id.* at 10; that the ALJ failed to follow the treating physician rule, *id.* at 12; and that the ALJ's vocational assessment was unsupported, *id*. at 17. The Commissioner responds that the ALJ's "findings are supported by substantial evidence and made by a correct application of legal principles," and should therefore be affirmed. Mot. Affirm, Doc. No. 30, at 1.

  A. <u>Did the ALJ fail to develop the administrative record?</u>

Etemi argues that the ALJ failed to develop the administrative record. Mem. Supp. Mot. Reverse, Doc. No. 21-2, at 2. Specifically, she alleges that the administrative record fails to

include medical reports from a number of doctors who treated Etemi before September 30, 2012 and the ALJ had an affirmative duty to obtain medical source statements or residual functional capacity assessments from those doctors. *Id.* at 2-10. Additionally, Etemi alleges that the ALJ improperly relied on Dr. Watson's opinion regarding Etemi's limitations. *Id.* at 9-10.

"[T]he ALJ, unlike a judge in a trial, must … affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even if the claimant is represented by counsel." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citation omitted) (internal quotation marks omitted). It is not "per se error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Sanchez v. Colvin*, 2015 WL 736102, at *5 (S.D.N.Y. 2015). The Second Circuit, however, has stated that medical reports submitted on behalf of the claimant "'*should* include … [a] statement about what [the claimant] can still do despite [the claimant's] impairment,' not that they *must* include such statements … [and] 'the lack of the medical source statement will not make the report incomplete." *Tankisi v. Commissioner of Social Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (emphasis in original) (citing 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)). "[W]here there are no obvious gaps in the administrative record, and whether the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information." *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)).

The failure of the ALJ to procure formal opinions about a claimant's residual functional capacity does not, by itself, require remand where the medical record is "quite extensive[,] … voluminous[,] … [and] adequate to permit an informed finding by the ALJ." *Tankisi*, 521 F. App'x at 34. "Remand is not always required when an ALJ fails in his duty to request opinions

particularly where … the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Id.* That is particularly true where the record includes assessments of the claimant's limitations from a treating physician. *Id.* Remand is required where an ALJ's residual functional capacity decision is "wholly unsupported by any medical evidence." *Jermyn v. Colvin*, 2015 WL 1298997, at *19 (E.D.N.Y Mar. 23, 2015).

Here, the ALJ noted that Etemi's lawyer "failed to prove a precise functional assessment to support [Etemi's] subjective complaints … [but] there [was] adequate information in the record to make an appropriate decision and no reason to believe that [additional medical opinions] would justify a different decision." ALJ Decision, R. at 20. The ALJ had before him an extensive and voluminous medical record including treatment notes from multiple doctors, independent medical examinations, medical tests, reports, a medical source opinion from an agency consultant, and testimonial evidence. In addition, the record contained a report from Etemi's treating hand physician, Dr. Watson, who reported that he cleared Etemi for "light duty" in November of 2010 and then "full duty" in January 2011. The ALJ relied on that opinion and stated that Dr. Watson's opinion was "consistent with the evidence." ALJ Decision, R. at 22. "In the absence of any obvious gaps or inconsistencies in the record … the ALJ was under no obligation to further develop the record." *O'Connell v. Colvin*, 558 F. App'x. 63, 64 (2d Cir. 2014). Accordingly, the ALJ's failure to procure formal opinions does not require remand under the circumstances.

B. <u>Did the ALJ fail to consider the plaintiff's impairments in combination?</u>

Etemi argues that the ALJ failed to consider her impairments in combination when rendering his decision. Mem. Supp. Mot. Reverse, Doc. No. 21-2, at 10. Specifically, Etemi

10

argues that the ALJ failed to consider the effect that her non-severe medical conditions could have had on her severe medical conditions.[1]  *Id.* at 10-12.

An ALJ is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B). An ALJ's decision is adequate if it makes clear, however, that he "considered all symptoms and the combination of impairments in making his determination." *O'Connell*, 558 F. App'x 65. Here, the ALJ extensively reviewed the evidence in his decision, including evidence related to Etemi's non-severe impairments. Indeed, he comprehensively cited to years of medical history regarding her non-severe medical conditions; ALJ Decision, R. at 13-16; and specifically stated that Etemi "did not have an impairment *or combination of impairments*" that medically met or equaled listed impairments. ALJ Decision, R. at 16 (emphasis added). Additionally, the ALJ made his determination "[a]fter careful consideration *of the entire record*" and after considering "*all symptoms*." *Id.* at 17 (emphasis added).

The ALJ's decision comports with the requirements laid out by the Second Circuit, namely that his decision specify that he considered "all symptoms and the combination of impairments." *O'Connell*, 558 F. App'x 65. Accordingly, there is no error.

---

[1] Etemi mentions briefly a number of her non-severe impairments, but highlights only her diabetes in her argument that the ALJ erred by not considering her non-severe impairments in conjunction with her other, severe impairments. She notes herself, though, that the ALJ specifically references her diabetes in his decision and that she had "no symptoms." Mem. Supp. Mot. Reverse, Doc. No. 21-2, at 10. The ALJ further noted that her diabetes was controlled with treatment. Tr. of ALJ Hr'g, R. at 16. Etemi argues that her doctor noted in her records that "diabetics can be prone to neuropathic changes." Mem. Supp. Mot. Reverse, Doc. No. 21-2, at 10. She does not highlight any evidence in the record, though, that any such changes did occur and impacted any of her severe, disabling impairments.

C. <u>Did the ALJ correctly evaluate the medical opinion evidence?</u>

Etemi argues that the ALJ failed to follow the treating physician rule and gave "enormous, near-controlling weight" to the evaluation of state non-reviewing physician, Dr. Angelina Jacobs. Mem. Supp. Mot. Reverse, Doc. No. 21-2, at 12.

"The treating physician rule provides that an ALJ should defer 'to the views of the physician who has engaged in the primary treatment of the claimant,'" but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in [the] case record."[2] *Cichocki v. Astrue*, 534 F. App'x 71, 74 (2d Cir. 2013) (summary order) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(c)(2)). When the ALJ gives controlling weight to a non-treating physician, and the does not give the treating source's opinion controlling weight, he must "apply the factors listed" in SSA regulations, 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a[n] … opinion," *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004), and provide "good reasons" for the weight assigned. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). But "where the ALJ's reasoning and adherence to the regulation are clear," he need not "slavish[ly] recite[] each and every factor" listed in the regulations. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013)

---

[2] Originally a rule devised by the federal courts, the treating physician rule is now codified by SSA regulations, but "the regulations accord less deference to unsupported treating physician's opinions than d[id] [the Second Circuit's] decisions." *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

12

(summary order). Moreover, "[g]enuine conflicts in the medical evidence are for the Commissioner"—not the court—"to resolve." *Burgess*, 537 F.3d at 128.

The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," and has advised that, ordinarily, "a consulting physician's opinions or reports should be given little weight." *Selian*, 708 F.3d at 419; *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). In some circumstances, however, "the report of a consultative physician may constitute [substantial] evidence." *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *see also Prince v. Astrue*, 490 F. App'x 399, 401 (2d Cir. 2013) ("consultative examinations were still rightly weighed as medical evidence"); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("the report of a consultative physician may constitute … substantial evidence").

An ALJ is entitled to rely on the opinions of state agency medical consultants in issuing decisions. *See Social Security Ruling 96-6p*, 1996 WL 374180 (1996). Here, the ALJ unquestionably relied upon the opinion of Dr. Jacobs' when deciding this case. *See* ALJ Decision, R. at 17; Reconsideration Explanation, R. at 68-73. The ALJ also cited to Dr. Jacobs' opinion during the hearing when asking Dr. Smith hypothetical questions regarding Etemi's residual functional capacity. Tr. of ALJ Hr'g, R. at 45. Etemi argues that the ALJ improperly credited Dr. Jacobs' opinion rather than the November 2007 opinion of her treating physician, Dr. Nelson, who opined that Etemi had "permanent restrictions of no repetitive use of the right upper extremity and no lifting greater than three to five pounds." Mem. Supp. Mot. Reverse, Doc. No. 21-2, at 14, *citing* Treatment Note by Dr. Watson (Nov. 19, 2007), R. at 352. The Commissioner argues that the ALJ had the discretion to rely on the opinion of Dr. Jacobs over Dr. Nelson, and that the treatment note from Dr. Nelson was over a year prior to the alleged

13

onset disability date of January 2, 2009. Mem. Supp. Mot. Affirm, Doc. No. 30-1, at 13. The Commissioner further argues that Dr. Nelson's notes were in relation to a Workers' Compensation claim and, therefore, the ALJ was free to disregard them in his determination here. *Id.*

It appears that Etemi's argument here is either: (1) that, absent a residual functional capacity assessment from a treating physician, Dr. Jacobs' opinion should not be given controlling weight; and/or (2) that Dr. Watson's November 2007 treatment note about Etemi's limitations should be treated as a residual functional capacity assessment and given controlling weight over Dr. Jacobs' opinion. I have already addressed the former argument with respect to Etemi's first claim of error. There, I decided that it was not error for the ALJ to decide the case without residual functional capacity assessments from treating physicians because the medical record before the ALJ was "quite extensive[,] … voluminous[,] … [and] adequate to permit an informed finding" regarding Etemi's residual functional capacity. *Tankisi*, 521 F. App'x at 34. With respect to the latter argument, Dr. Watson's November 2007 treatment note regarding Etemi's capacity was written over a year before the onset of the alleged disability. Treatment Note by Dr. Watson (Nov. 19, 2007), R. at 352. More recently, Dr. Watson had cleared Etemi for "full duty" work as of January 17, 2011. ALJ Decision, R. at 19. Further, the ALJ comprehensively stated his reasons for relying on Dr. Jacobs' opinion, and the support he found in the record for his decision. ALJ Decision, R. at 19-23. Accordingly, the ALJ did not err when he afforded substantial weight to Dr. Jacobs' medical opinion.

D. <u>Was the ALJ's residual functional capacity determination supported by substantial evidence?</u>

Etemi argues that the ALJ's residual functional capacity determination was not supported by substantial evidence because it was based solely on the limitations expressed by the document

14

reviewer, and "on no other basis." Mem. Supp. Mot. Reverse, Doc. No. 21-2, at 17. In particular, Etemi asserts that the ALJ failed to consider that Etemi has asthma and COPD, *id*.; that her multiple surgeries on her upper extremities preclude her being able to climb a rope, *id*. at 18; and that her carpal tunnel syndrome and tenosynovitis preclude her from being able to "reach, handle, or finger." *Id.* The Commissioner responds that the ALJ's residual functional capacity findings were adequately supported by the record. Mem. Supp. Mot. Affirm, Doc. No. 30-1, at 14-16. I agree with the Commissioner.

Between steps three and four of the SSA's analysis for disability claims, the ALJ must "determine[], based on all the relevant medical and other evidence of record, the claimant's 'residual functional capacity,' which is what the claimant can still do despite the limitations imposed by [her] impairment." *Greek*, 802 F.3d at 373 n.2 (citing C.F.R. § 404.1520(b)). The ALJ's determination need not "perfectly correspond with" any medical source opinion. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). Rather, the ALJ is "entitled to weigh all of the evidence available to make a[] … finding that [is] consistent with the record as a whole." *Id.* In assessing a claimant's residual functional capacity, SSA regulations require the ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)," as well as "discuss[ing] the [claimant]'s ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis … and describ[ing] the maximum amount of each work-related activity the [claimant] can perform based on the evidence available in the case record." Social Security Ruling 96-8p, 1996 WL 374184, at *7. Finally, the ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

15

In making a residual functional capacity determination in the present case, ALJ Resnick extensively considered Etemi's complaints as well as her voluminous medical records. Regarding her asthma and COPD, the ALJ cited the record and stated:

> [Etemi initially] testified she had asthma attacks every week then she reported she had five in the last year; however, records noted rare use of her inhaler, no asthma, and well controlled COPD. She testified she had four emergency room visits since 2009 for asthma attacks that were not in the record yet she repeatedly informed the Waterbury Pulmonary Associates that she had no emergency room visits.

ALJ Decision, R. at 21. Further, the ALJ noted that Etemi's examinations for asthma and COPD were "generally unremarkable with normal respiration, clear lungs/breath sounds, no dyspnea, no respiratory distress, no cough, a normal chest wall, no wheezes/rales/rhonchi/rubs, and no accessory muscle use." *Id*. at 22. The ALJ also cited records that reported Etemi's asthma as "controlled" and there was no "observed/perceived … difficulty with breathing or talking," that other records showed "none to mild obstructive lung disease," and that Etemi generally informed doctors that "she felt well with good symptom control [and] none to rare use of a rescue inhaler." *Id.* The ALJ noted that although Etemi alleged that she could walk less than one block, "there is nothing in the record to support such a limitation, as respiratory examinations were generally unremarkable." *Id.* The ALJ further noted that although Etemi alleged that she had worsening dyspnea and coughing for three years, "respiratory examinations were generally benign," she had "only mild dyspnea on stair climbing," and she "denied chest pain/discomfort, coughing, wheezing, and dizziness." *Id.* The ALJ concluded that "the record [did] not support the degree of respiratory limitation alleged during the period January 2, 2009, through September 30, 2012." *Id.* Additionally, taking into consideration her respiratory concerns, the ALJ noted in his assessment of her residual functional capacity that Etemi "cannot be exposed to concentrated fumes, odors, dust, gases or poor ventilation." *Id.* at 17.

16

Regarding her carpal tunnel syndrome, tenosynovitis, and upper extremities, the ALJ cited medical records beginning in 2007 which "revealed a within normal right upper extremity with no sign of [carpal tunnel syndrome]." ALJ Decision, R. at 17 (referencing Exhibit 4F). The ALJ noted that in 2009, Etemi had a "normal" ultrasound on her upper right extremity and that Dr. Watson was "unable to create a diagnosis or diagnostic test" for her treatment. *Id*. The ALJ cited medical records for the proposition that Etemi's arm injuries derived from a 2003 fall, after which she did not seek medical treatment for eight months. *Id.* at 18. The ALJ further cited a 2010 Independent Medical Examination in which the doctor "stated that [Etemi] underwent eight surgeries for an injury that apparently happened eight months before she sought medical treatment. He assessed a 0 percent permanent partial impairment from [carpal tunnel syndrome] and trigger thumbs. He reported [that Etemi] had subjective pain without a clear objective source and the pain was not a surgical issue." *Id*. The ALJ cited that Dr. Watson diagnosed Etemi with carpal tunnel syndrome and performed surgery on both hands and released her to full duty work in January 2011 after finding that she had "no objective abnormalities" and Dr. Watson opined that she had "[no] further restrictions." *Id.* at 19. The ALJ cited five years of medical reports that Etemi reported feeling well. *Id.* (referencing Exhibits 8F, 11F-19F).

The ALJ further stated that although Etemi testified that she had trouble sitting, standing, and walking for long periods of time, had trouble writing or lifting, could not reach overhead with her right arm, and "could not perform repetitive pushing or pulling with the upper extremities … had difficulty with opening jars, buttoning, cutting food, and focusing," her alleged limitations were "not consistent with the limited findings on examinations, the positive response to treatment, and [her] activities." *Id*. at 21. The ALJ found "no evidence demonstrating significant hand/arm problems since the bilateral carpal tunnel releases and trigger

17

thumb releases." *Id.* at 23. Accordingly, he found that Etemi's "purported symptoms" conflicted with both the medical evidence and her "level of functioning." *Id.*

It is clear from the ALJ's decision that he extensively considered Etemi's complaints as well as her voluminous medical records and provided support from the record for the determinations he made. An ALJ need not mention every piece of evidence, particularly when the record is large, as it is here. *Chickocki*, 729 F.3d at 178 n.3 ("[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision"); *Mongeur*, 722 F.2d 1030 (an ALJ need not recite every piece of evidence or "explain[] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion"). Even if "the administrative record may also adequately support" the conclusion that Etemi was limited in her use of her hands/arm and had respiratory limitations, the ALJ's "contrary finding[]" is supported by substantial evidence and "must be given conclusive effect." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). Under that "very deferential standard of review," I consider the ALJ's residual functional capacity finding to have been based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Therefore, because "there is substantial evidence to support the determination," I affirm the ALJ's decision on that point. *See Selian*, 708 F.3d at 417.

IV.    **Conclusion**

For the reasons set forth above, I GRANT the Commissioner's Motion to Affirm (Doc. No. 30), and DENY Etemi's Motion to Reverse (Doc. No. 21).

The Clerk shall enter judgment and close the case.

So ordered.

18

Dated at Bridgeport, Connecticut, this 27th day of March 2018.

                                                                                                       <u>/s/ STEFAN R. UNDERHILL</u>
                                                                                                        Stefan R. Underhill
                                                                                                         United States District Judge